UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

AUG 2 7 1997

Michael N. Milby, Clerk of Court

| | |
|---|---|
| AMERICAN DENTAL TECHNOLOGIES, INC., )<br>)<br>Plaintiff,       )<br>)<br>v.              )<br>)<br>KREATIV, INC.,      )<br>)<br>Defendant.   )<br>_____ ) | C.A. No. C-97-374<br>JURY TRIAL DEMANDED |

## DEFENDANT, KREATIV, INC.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF AMERICAN DENTAL TECHNOLOGIES, INC.'S COMPLAINT

Defendant Kreativ, Inc. ("Kreativ") answers the Complaint as follows:

1. Kreativ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint.

2. Kreativ admits the allegations in paragraph 2 of the Complaint.

3. Kreativ admits that it does business in this district, but denies that a substantial part of the events or omissions giving rise to ADT's claims occurred in the Southern District of Texas. Kreativ further denies any implied allegations that it engaged in unlawful conduct in this district, or anywhere.

4. Kreativ admits that this Court has subject matter jurisdiction and that technical venue exists, but denies that venue is convenient for the parties and witnesses.

5. Kreativ admits that the allegations in paragraph 5 of the Complaint.

6. Kreativ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Complaint.

7. Kreativ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7.

8. Kreativ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint.

9. Kreativ lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint.

10. Kreativ admits that ADT purports to allege the infringement of certain patents.

11. Kreativ repeats and incorporates by reference its answers to paragraphs 1-9.

12. Kreativ denies each and every allegation in paragraph 12 of the Complaint.

13. Kreativ denies each and every allegation in paragraph 13 of the Complaint.

14. Kreativ denies each and every allegation in paragraph 14 of the Complaint.

15. Kreativ denies each and every allegation in paragraph 15 of the Complaint.

16. Kreativ denies each and every allegation in paragraph 16 of the Complaint.

17. Kreativ admits that ADT purports to allege the infringement of certain patents.

18. Kreativ repeats and incorporates by reference its answers to paragraphs 1-9.

19. Kreativ denies each and every allegation in paragraph 19 of the Complaint.

20. Kreativ denies each and every allegation in paragraph 20 of the Complaint.

21. Kreativ denies each and every allegation in paragraph 21 of the Complaint.

22. Kreativ denies each and every allegation in paragraph 22 of the Complaint.

23. Kreativ denies each and every allegation in paragraph 23 of the Complaint.

24. Kreativ denies each and every allegation in paragraph 24 of the Complaint.

25. Kreativ admits that ADT purports to allege the infringement of certain patents.

26. Kreativ repeats and incorporates by reference its answers to paragraphs 1-9.

27. Kreativ denies each and every allegation in paragraph 27 of the Complaint.

28. Kreativ denies each and every allegation in paragraph 28 of the Complaint.

29. Kreativ denies each and every allegation in paragraph 29 of the Complaint.

30. Kreativ denies each and every allegation in paragraph 30 of the Complaint.

31. Kreativ denies each and every allegation in paragraph 31 of the Complaint.

32. Kreativ denies each and every allegation in paragraph 32 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Kreativ has not infringed, actively induced infringement, or committed acts of contributory infringement relating to the claims of the patents in suit.

## THIRD AFFIRMATIVE DEFENSE

ADT is barred from relief against Kreativ because the patents at issue are invalid and unenforceable for failure to meet the conditions of patentability specified by 35 U.S.C. §§ 102, 103 and 112.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint and requested relief are barred by the doctrine of file wrapper estoppel.

## FIFTH AFFIRMATIVE DEFENSE

Upon information and belief, ADT is barred from relief against Kreativ by the doctrines of estoppel, laches, waiver, unclean hands, or other applicable equitable doctrines.

21351971
0082697

3.

## SIXTH AFFIRMATIVE DEFENSE

Upon information and belief, plaintiff lacks standing and is not the real party in interest.

## COUNTERCLAIMS FOR DECLARATORY JUDGEMENT OF PATENT NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY; DEMAND FOR JURY

Counterclaimant, Kreativ, Inc. (hereinafter "Kreativ") for its Counterclaims against American Dental Technologies, Inc. (hereinafter "counterdefendant" or "ADT") states as follows:

1.      Kreativ is an Oregon corporation in good standing, having its headquarters and manufacturing facilities in Albany, Oregon. Kreativ is in the business of manufacturing air abrasive dental products.

2.      On information and belief, ADT is a Delaware corporation, having its principal office and place of business at 28411 Northwestern Highway, Suite 1100, Southfield, Michigan 48034-5541.

### JURISDICTION AND VENUE

3.      This is an action for resolution of conflict under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The underlying causes of action arise under the patent laws of the United States, including 35 U.S.C. §§ 271 and 282. Kreativ seeks a declaration by this Court that United States Letters Patent Numbers 5,275,561 (the "'561 patent"), 5,350,299 (the "'299" patent), 5,525,058 (the "'058" patent) and 5,330,354 (the "'354 patent) purportedly assigned to ADT, are not infringed by Kreativ and/or are invalid and/or unenforceable. The subject matter jurisdiction of this Court is therefore established by 28 U.S.C. §§ 1331 and 1338.

4.     This action presents an actual case or controversy because the acts of ADT have created in Kreativ a reasonable apprehension that, as a result of Kreativ's manufacture, use, sale and/or promotion of air abrasion dental equipment in the United States, Kreativ has been sued in the Southern District of Texas for infringement of the '561, '299 and '058 patents.  The '299 and '058 patents are related to the '354 patent.  The '299 patent issued on application number 29,732 filed March 25, 1993, which is a continuation-in-part of application Ser. No. 859,158 filed March 27, 1992, which issued as the patent.  The '058 patent is a continuation-in-part of application Ser. No. 859,158 filed March 27, 1992, which issued as '354 patent and a continuation-in-part of Ser. No. 29,732, filed March 25, 1993 which issued as '299 patent.   There is a substantial and continuing justiciable controversy between Kreativ and ADT as to ADT's right to threaten Kreativ and/or maintain suit against Kreativ for infringement of the '561, '299, '058 and '354  patents and as to the non-infringement, invalidity, and unenforceability of the patents.

5.     Venue for this action is proper in this judicial district under 28 U.S.C §§ 1391 and 1400.

## GENERAL ALLEGATIONS

6.     On or about June 19, 1994, the U.S. Patent Office issued the '354 patent to Ben J. Gallant.  Kreativ is informed and believes and on that basis alleges that Mr. Gallant assigned his rights to the '354 patent to ADT.

7.     On or about January 4, 1994, the U.S. Patent Office issued the '561 patent to Daniel S. Goldsmith.  Kreativ is informed and believes and on that basis alleges that Mr. Goldsmith assigned his rights in the '561 patent to American Dental Laser, Inc.  On information and belief, ADT purports to be the owner of the '561 patent.

8.      On or about September 27, 1994, the U.S. Patent Office issued the '299 patent to Ben J. Gallant. Kreativ is informed and believes and on that basis alleges that Mr. Gallant assigned his rights to the '299 patent to ADT.

9.      On or about June 11, 1996, the U.S. Patent Office issued the '058 patent to Ben J. Gallant, Alan N. Gleeman and William S. Parker. Kreativ is informed and believes and on that basis alleges that Messrs. Gallant, Gleeman and Parker assigned their rights to the '058 patent to ADT.

10.    Kreativ believes that this is an exceptional case under 28 USC § 285.

## COUNT I.

### DECLARATORY JUDGMENT THAT COUNTERCLAIMANT KREATIV DOES NOT INFRINGE DIRECTLY OR INDIRECTLY ANY OF THE CLAIMS OF THE '561 PATENT AND/OR THAT THE '561 PATENT IS INVALID AND/OR UNENFORCEABLE

11.    Kreativ repeats and realleges paragraphs 1 through 10 of this Counter-Complaint as if the same were fully set forth herein.

12.    Kreativ does not manufacture, use, import, offer to sell and/or sell any products which infringe directly and/or indirectly any of the claims of the '561 patent. Nor does Kreativ engage in any other activities which directly and/or indirectly infringe any of the claims of the '561 patent.

13.    Kreativ alleges on information and belief that claims 10 and 19 of the '561 patent are invalid, unenforceable and void for failing to satisfy 35 USC §§ 102, 103 and/or 112, and for one or more of the following reasons:

a.      By reason of the proceedings in the Patent Office during the prosecution of the application which resulted in the '561 patent as shown by the file wrapper

21351971
0082697                                    6.

CutePDF - www.fastio.com

thereof, ADT is estopped to assert for the '561 patent any construction of limitations of any particular claim that would cause any such claim of the '561 patent to cover or include any apparatus, device, product or method manufactured, used or sold by Kreativ.

      b.    The patentee did not invent the subject matter patented in the '561 patent, nor did he make any invention or discovery, either novel, original, or otherwise, within the meaning of the United States Code, Title 35.

      c.    The alleged invention of the '561 patent was made by another in this country before the patentee's alleged invention, and such other person had not abandoned, suppressed or concealed it.

      d.    The '561 patent does not particularly point out and distinctly claim the part, improvement, method, steps, or combination which the patentees claim as their invention, as required by United States Code, Title 35.

      e.    The specification of the '561 patent does not contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most nearly connected, to make, construct, compound, and/or use the same, and the description does not adequately explain the principle so as to distinguish it from other inventions, as required by United States Code, Title 35.

      f.    The claims, and each of them, of the '561 patent are excessively vague and indefinite and do not distinctly point out and define the invention.

      g.    The claims of the '561 patent, and each of them, are not directed to patentable combinations, but are directed to mere aggregations of parts or steps, means, or elements which were matters of common knowledge in the art to which the '561 patent

21351971
0082697

7.

CutePDF - www.fastio.com

relates before the alleged invention and more than one year prior to the date of the original application leading to the '561 patent.

       h.     In light of the prior art at the time the alleged invention was made, the subject matter as claimed in the '561 patent would have been obvious to a person skilled in the art to which the alleged invention relates and therefore does not constitute a patentable invention.

       i.     More than one year prior to the filing of the original application leading to the '561 patent, the alleged invention was patented or described in printed publications in this or a foreign country, or was in public use or on sale in this country.

       j.     Before the alleged invention or discovery by the patentees, the alleged invention was known or used by other than the alleged inventors and was on sale in this country and patented or described in printed publications in this or in a foreign country.

       k.     If there be an invention in the subject matter of the '561 patent, which Kreativ believes there is not, the '561 patent nevertheless was not obtained in a manner consistent with the provisions of United States Code, Title 35 and 37 C.F.R.

       l.     The claims of the '561 patent are functional, indefinite, and are broader than the alleged invention as set forth in the specification of the '561 patent.

### COUNT II.

#### DECLARATORY JUDGMENT THAT COUNTERCLAIMANT KREATIV DOES NOT INFRINGE DIRECTLY OR INDIRECTLY ANY OF THE CLAIMS OF THE '299 PATENT AND/OR THAT THE '299 PATENT IS INVALID AND/OR UNENFORCEABLE

     14.     Kreativ repeats and realleges paragraphs 1 through 11 of this Complaint as if the same were fully set forth herein.

21351971
0082697
                8.

15. Kreativ does not manufacture, use, import, offer to sell and/or sell any products which infringe directly and/or indirectly any of the claims of the '299 patent. Nor does Kreativ engage in any other activities which directly and/or indirectly infringe any of the claims of the '299 patent.

16. Kreativ alleges on information and belief that claims 1 of the '299 patent is invalid, unenforceable and void for failing to satisfy, 35 USC §§ 102, 103 and/or 112 for one or more of the following reasons:

a. By reason of the proceedings in the Patent Office during the prosecution of the application which resulted in the '299 patent as shown by the file wrapper thereof, ADT is estopped to assert for the '299 patent any construction of limitations of any particular claim that would cause any such claim of the '299 patent to cover or include any apparatus, device, product or method manufactured, used or sold by Kreativ.

b. The patentee did not invent the subject matter patented in the '299 patent, nor did he make any invention or discovery, either novel, original, or otherwise, within the meaning of the United States Code, Title 35.

c. The alleged invention of the '299 patent was made by another in this country before the patentees' alleged invention, and such other person had not abandoned, suppressed or concealed it.

d. The '299 patent does not particularly point out and distinctly claim the part, improvement, method, steps, or combination which the patentees claim as their invention, as required by United States Code, Title 35.

e. The specification of the '299 patent does not contain a written description of the invention and of the manner and process of making and using it, in such

full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most nearly connected, to make, construct, compound, and/or use the same, and the description does not adequately explain the principle so as to distinguish it from other inventions, as required by United States Code, Title 35.

f.  The claims of the '299 patent are excessively vague and indefinite and do not distinctly point out and define the invention.

g.  The claims of the '299 patent, and each of them, are not directed to patentable combinations, but are directed to mere aggregations of parts or steps, means, or elements which were matters of common knowledge in the art to which the '299 patent relates before the alleged invention and more than one year prior to the date of the original application leading to the '299 patent.

h.  In light of the prior art at the time the alleged invention was made, the subject matter as claimed in the '299 patent would have been obvious to a person skilled in the art to which the alleged invention relates and therefore does not constitute a patentable invention.

i.  More than one year prior to the filing of the original application leading to the '299 patent, the alleged invention was patented or described in printed publications in this or a foreign country, or was in public use or on sale in this country.

j.  Before the alleged invention or discovery by the patentee, the alleged invention was known or used by other than the alleged inventor and was on sale in this country and patented or described in printed publications in this or in a foreign country.

k.     If there be an invention in the subject matter of the '299 patent, which Kreativ believes there is not, the '299 patent nevertheless was not obtained in a manner consistent with the provisions of United States Code, Title 35 and 37 C.F.R.

l.     The claim of the '299 patent is functional, indefinite, and are broader than the alleged invention as set forth in the specification of the '299 patent.

## COUNT III.

### DECLARATORY JUDGMENT THAT COUNTERCLAIMANT KREATIV DOES NOT INFRINGE DIRECTLY OR INDIRECTLY ANY OF THE CLAIMS OF THE '058 PATENT AND/OR THAT THE '058 PATENT IS INVALID AND/OR UNENFORCEABLE

17.     Kreativ repeats and realleges paragraphs 1 through 11 of this Complaint as if the same were fully set forth herein.

18.     Kreativ does not manufacture, use, import, offer to sell and/or sell any products which infringe directly and/or indirectly any of the claims of the '058 patent.  Nor does Kreativ engage in any other activities which directly and/or indirectly infringe any of the claims of the '058 patent.

19.     Kreativ alleges on information and belief that claims 1-4 of the '058 patent is invalid, unenforceable and void for failing to satisfy 35 USC §§ 102, 103 and/or 112 for one or more of the following reasons:

a.     By reason of the proceedings in the Patent Office during the prosecution of the application which resulted in the '058 patent as shown by the file wrapper thereof, ADT is estopped to assert for the '058 patent any construction of limitations of any particular claim that would cause any such claim of the '058 patent to cover or include any apparatus, device, product or method manufactured, used or sold by Kreativ.

b.      The patentees did not invent the subject matter patented in the '058 patent, nor did they make any invention or discovery, either novel, original, or otherwise, within the meaning of the United States Code, Title 35.

c.      The alleged invention of the '058 patent was made by another in this country before the patentee's alleged invention, and such other person had not abandoned, suppressed or concealed it.

d.      The '058 patent does not particularly point out and distinctly claim the part, improvement, method, steps, or combination which the patentees claim as their invention, as required by United States Code, Title 35.

e.      The specification of the '058 patent does not contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most nearly connected, to make, construct, compound, and/or use the same, and the description does not adequately explain the principle so as to distinguish it from other inventions, as required by United States Code, Title 35.

f.      The claims, and each of them, of the '058 patent are excessively vague and indefinite and do not distinctly point out and define the invention.

g.      The claims of the '058 patent, and each of them, are not directed to patentable combinations, but are directed to mere aggregations of parts or steps, means, or elements which were matters of common knowledge in the art to which the '058 patent relates before the alleged invention and more than one year prior to the date of the original application leading to the '058 patent.

h.     In light of the prior art at the time the alleged invention was made, the subject matter as claimed in the '058 patent would have been obvious to a person skilled in the art to which the alleged invention relates and therefore does not constitute a patentable invention.

i.     More than one year prior to the filing of the original application leading to the '058 patent, the alleged invention was patented or described in printed publications in this or a foreign country, or was in public use or on sale in this country.

j.     Before the alleged invention or discovery by the patentee, the alleged invention was known or used by other than the alleged inventor and was on sale in this country and patented or described in printed publications in this or in a foreign country.

k.     If there be an invention in the subject matter of the '058 patent, which Kreativ believes there is not, the '058 patent nevertheless was not obtained in a manner consistent with the provisions of United States Code, Title 35 and 37 C.F.R.

l.     The claims of the '058 patent are functional, indefinite, and are broader than the alleged invention as set forth in the specification of the '058 patent.

## COUNT IV.

### DECLARATORY JUDGMENT THAT COUNTERCLAIMANT KREATIV DOES NOT INFRINGE DIRECTLY OR INDIRECTLY ANY OF THE CLAIMS OF THE '354 PATENT AND/OR THAT THE '354 PATENT IS INVALID AND/OR UNENFORCEABLE

20.     Kreativ repeats and realleges paragraphs 1 through 11 of this Complaint as if the same were fully set forth herein.

21.     Kreativ does not manufacture, use, import, offer to sell and/or sell any products which infringe directly and/or indirectly any of the claims of the '354 patent. Nor

does Kreativ engage in any other activities which directly and/or indirectly infringe any of the claims of the '354 patent.

22. Kreativ alleges on information and belief that the '354 patent is invalid, unenforceable and void for failing to satisfy 35 USC §§ 102, 103 and/or 112 for one or more of the following reasons:

a. By reason of the proceedings in the Patent Office during the prosecution of the application which resulted in the '354 patent as shown by the file wrapper thereof, ADT is estopped to assert for the '354 patent any construction of limitations of any particular claim that would cause any such claim of the '354 patent to cover or include any apparatus, device, product or method manufactured, used or sold by Kreativ.

b. The patentee did not invent the subject matter patented in the '354 patent, nor did he make any invention or discovery, either novel, original, or otherwise, within the meaning of the United States Code, Title 35.

c. The alleged invention of the '354 patent was made by another in this country before the patentee's alleged invention, and such other person had not abandoned, suppressed or concealed it.

d. The '354 patent does not particularly point out and distinctly claim the part, improvement, method, steps, or combination which the patentees claim as their invention, as required by United States Code, Title 35.

e. The specification of the '354 patent does not contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most nearly connected, to make, construct, compound,

21351971
0082697
14.

and/or use the same, and the description does not adequately explain the principle so as to distinguish it from other inventions, as required by United States Code, Title 35.

f. The claims, and each of them, of the '354 patent are excessively vague and indefinite and do not distinctly point out and define the invention.

g. The claims of the '354 patent, and each of them, are not directed to patentable combinations, but are directed to mere aggregations of parts or steps, means, or elements which were matters of common knowledge in the art to which the '354 patent relates before the alleged invention and more than one year prior to the date of the original application leading to the '354 patent.

h. In light of the prior art at the time the alleged invention was made, the subject matter as claimed in the '354 patent would have been obvious to a person skilled in the art to which the alleged invention relates and therefore does not constitute a patentable invention.

i. More than one year prior to the filing of the original application leading to the '354 patent, the alleged invention was patented or described in printed publications in this or a foreign country, or was in public use or on sale in this country.

j. Before the alleged invention or discovery by the patentee, the alleged invention was known or used by other than the alleged inventor and was on sale in this country and patented or described in printed publications in this or in a foreign country.

k. If there be an invention in the subject matter of the '354 patent, which Kreativ believes there is not, the '354 patent nevertheless was not obtained in a manner consistent with the provisions of United States Code, Title 35 and 37 C.F.R.

21351971
0082697                                    15.

1.    The claims of the '354 patent are functional, indefinite, and are broader than the alleged invention as set forth in the specification of the '354 patent.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff Kreativ prays that the Court enter judgment as follows:

### On Count I

(a)    United States Letters Patent Number 5,275,561 is invalid, unenforceable, and/or not infringed by plaintiff Kreativ;

(b)    ADT, its respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them, and each of them, are permanently enjoined and restrained:

    (i)    From making any claims to any person or entity that any of Kreativ's products and/or activities infringe any claim of the '561 patent, or that any use of any such products infringes the '561 patent;

    (ii)    From interfering with or threatening to interfere with the manufacture, sale or use of Kreativ's products by Kreativ, its distributors, customers, predecessors, successors or assigns; and

    (iii)    From instituting or prosecuting any lawsuit or proceedings placing in issue the rights of Kreativ, its distributors, customers, predecessors,

successors or assigns, to make, use or sell

Kreativ's products;

(c)      Kreativ be paid its costs and reasonable attorney fees by ADT; and

(d)      Such other and further relief as the Court may deem appropriate.

### On Count II

(a)      United States Letters Patent Number 5,350,299 is invalid, unenforceable, and/or not infringed by plaintiff Kreativ;

(b)      ADT, its respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them, and each of them, are permanently enjoined and restrained:

      (i)      From making any claims to any person or entity that any of Kreativ's products and/or activities infringe any claim of the '299 patent, or that any use of any such products infringes the '299 patent;

      (ii)      From interfering with or threatening to interfere with the manufacture, sale or use of Kreativ's products by Kreativ, its distributors, customers, predecessors, successors or assigns; and

      (iii)      From instituting or prosecuting any lawsuit or proceedings placing in issue the rights of Kreativ,

21351971
0082697

17.

its distributors, customers, predecessors,

successors or assigns, to make, use or sell

Kreativ's products;

(c)     Kreativ be paid its costs and reasonable attorney fees by ADT; and

(d)     Such other and further relief as the Court may deem appropriate.

## On Count III

(a)     United States Letters Patent Number 5,525,058 is invalid, unenforceable, and/or not infringed by plaintiff Kreativ;

(b)     ADT, its respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them, and each of them, are permanently enjoined and restrained:

(i)     From making any claims to any person or entity that any of Kreativ's products and/or activities infringe any claim of the '058 patent, or that any use of any such products infringes the '058 patent;

(ii)    From interfering with or threatening to interfere with the manufacture, sale or use of Kreativ's products by Kreativ, its distributors, customers, predecessors, successors or assigns; and

  (iii) From instituting or prosecuting any lawsuit or
proceedings placing in issue the rights of Kreativ,
its distributors, customers, predecessors,
successors or assigns, to make, use or sell
Kreativ's products;

(c) Kreativ be paid its costs and reasonable attorney fees by ADT;
and

(d) Such other and further relief as the Court may deem
appropriate.

**On Count IV**

(a) United States Letters Patent Number 5,330,354 is invalid,
unenforceable, and/or not infringed by plaintiff Kreativ;

(b) ADT, its respective officers, agents, servants, employees,
attorneys, and all persons acting in concert with them, and each
of them, are permanently enjoined and restrained:

  (i) From making any claims to any person or entity
that any of Kreativ's products and/or activities
infringe any claim of the '354 patent, or that any
use of any such products infringes the '354
patent;

  (ii) From interfering with or threatening to interfere
with the manufacture, sale or use of Kreativ's

products by Kreativ, its distributors, customers, predecessors, successors or assigns; and

(iii) From instituting or prosecuting any lawsuit or proceedings placing in issue the rights of Kreativ, its distributors, customers, predecessors, successors or assigns, to make, use or sell Kreativ's products;

(c) Kreativ be paid its costs and reasonable attorney fees by ADT; and

(d) Such other and further relief as the Court may deem appropriate.

21351971
0082697                                                          20.

CtrlPDF - www.fastio.com

## JURY DEMAND

Kreativ demands a trial by jury on all issues so triable.

Dated:  August 26, 1997

By: _Daniel Johnson Jr_ (signature)
Daniel Johnson, Jr.
California Bar No. 57409

Michelle Greer Galloway
California Bar No. 142152

Attorneys in Charge for Defendant/
Counterclaimant, Kreativ, Inc.

OF COUNSEL:

COOLEY GODWARD LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Phone: (650) 843-5000
Fax:   (650) 857-0663

OF COUNSEL:
Tom Hermansen
Texas Bar No. 09514000
Fed. ID No. 0915
Tana S. Schlimmer
Texas Bar No. 00784992
Fed ID No. 16629

HUNT, HERMANSEN, McKIBBEN &
ENGLISH, L.L.P.
1100 Tower II
555 Carancahua
Corpus Christi, TX 78478
Phone: (512) 882-6611
Fax:   (512) 883-8353

Vincent A. Colianni
California Bar No. 177555

Attorney of Record

21351971
0082697

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant Kreativ, Inc.'s Answer and Counterclaims to Plaintiff American Dental Technologies, Inc.'s Complaint was served by certified mail, return receipt requested on this the 27ᵗʰ day of August, 1997 to the following:

Mr. Joseph F. Posillico, Esq.
Mr. Stephen J. Driscoll, Esq.
1101 Market Street
2600 Aramark Tower
Philadelphia, PA 19107-2950



_____
Daniel Johnson, Jr.
*with permission by*
*Tina S. Schlemmer*

Case 2:97-cv-00374   Document 8   Filed in TXSD on 08/27/97   Page 23 of 42



US005330354A

# United States Patent [19]

## Gallant

[11] Patent Number: **5,330,354**

[45] Date of Patent: **Jul. 19, 1994**

[54] **DENTAL TREATMENT SYSTEM**

[75] Inventor: **Ben J. Gallant**, Corpus Christi, Tex.

[73] Assignee: **American Dental Technologies, Inc.,** Troy, Mich.

[21] Appl. No.: **859,158**

[22] Filed: **Mar. 27, 1992**

[51] Int. Cl.⁵ ............................................. A61C 3/02
[52] U.S. Cl. ....................................... 433/88; 51/410
[58] Field of Search ..................... 433/88; 51/410, 438

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,661,537 | 12/1953 | Angell | 433/88 |
| 2,969,049 | 12/1954 | Black | 433/88 |
| 3,971,375 | 7/1976 | Hill | 128/173 |
| 4,276,023 | 6/1981 | Phillips et al. | 433/85 |
| 4,492,575 | 1/1985 | Mabille | 433/88 |
| 4,494,932 | 1/1985 | Rzewinski | 433/88 |
| 4,635,897 | 1/1987 | Gallant | 251/5 |
| 4,708,534 | 11/1987 | Gallant | 406/75 |
| 4,767,404 | 8/1988 | Renton | 604/48 |
| 4,826,431 | 5/1989 | Fujimura et al. | 433/29 |
| 4,893,440 | 1/1990 | Gallant et al. | 51/436 |

*Primary Examiner*—John J. Wilson
*Attorney, Agent, or Firm*—Synnestvedt & Lechner

[57] **ABSTRACT**

A system of treating teeth or associated tooth structure uses abrasive-laden fluid stream. The system provides air at high pressure to a manifold with selectively operable valves delivers fluid at a selected pressure to a device for mixing the fluid with abrasive and delivers the air/abrasive mix to a hand-held device for application of an abrasive-laden stream to a tooth or associated tooth structure. Priming air at a relatively low pressure pressurizes the air/abrasive device. A flow path for pure air bypasses the air/abrasive device. A selective control allows for optional delivery of a stream of air or air and abrasive to the tooth or associated tooth structure. Upon termination of a treatment, the pure air is diverted through a purge line to purge the system downstream from the abrasive device of abrasive particles. A vacuum removes abrasive particles and debris from the region of the mouth of the patient during and after the abrasive treatment operation. The abrasive delivery device includes a hand-held nozzle having fluid ports operable by the fingers of the operator to control the instrument. The vacuum includes a rigid, disposable collection chamber for sterile disposal of the abrasive material and debris. Pressure regulating and relief means insure instantaneous change from one pressure level to the next.

**51 Claims, 6 Drawing Sheets**



Case 2:97-cv-00374  Document 8  Filed in TXSD on 08/27/97  Page 24 of 42

**1**

## DENTAL TREATMENT SYSTEM

### FIELD OF THE INVENTION

The present invention relates to systems used in the practice of dentistry, and more particularly, to systems for cutting, excavating and etching teeth or associated tooth structure by means of finely divided abrasive materials carried in a fluid stream.

### BACKGROUND OF THE INVENTION

The use of abrasive-laden fluid streams to treat teeth has long been known. For example, U.S. Pat. No. 2,661,537 to Angell describes equipment for treating teeth with a relatively high-pressure stream laden with abrasive particles. While the use of such equipment has gained a significant degree of success in connection with the cleaning of teeth, there has heretofore been an overall lack of success in the dental industry with respect to the use of such equipment for cutting, excavating or etching teeth. Applicant has found that this lack of success can be attributed to several heretofore unrecognized disadvantages associated with equipment of the type described in Angell.

For example, cutting or etching of teeth with gas/abrasive streams frequently requires a source of fluid at pressures of at least about 120 psig. Unfortunately, however, compressed air in the range of about 60 to 80 psig is generally the highest pressure available in dental operatories. In order to overcome this limitation, the Angell patent describes the use cylinders containing $CO_2$ gas at a pressure of about 800 psig as a source of pressurized fluid. Applicant has found that there are numerous disadvantages associated with the use of pressurized gas in this form. For example, applicant has found that one important factor in achieving successfully cutting, etching and/or excavating tooth enamel is proper regulation and control of the pressure at which such operations are carried out. Such precise control and regulation is difficult to achieve in the system described in Angel. One reason for this difficulty is the very large pressure differentials between the pressure needed to operate the system (e.g. 100 to 120 psig) and the pressure at which the gas is delivered (800 psig). In particular, the accuracy of pressure regulation equipment is frequently inversely proportional to the pressure differential across the regulating device. Thus, the precision of the regulated pressure frequently decreases as the pressure differential increases.

Another disadvantage of the equipment described in Angell is that it is capable of providing only two pressure levels for the fluid utilized to operate the system. Applicant has found that this is another reason for the lack of success achieved by prior devices. It is highly desirable to operate at more than two distinct and different pressure levels because of the multiplicity of dental procedures performed by the dentist. The equipment described in Angell, however, is capable of supplying fluid at only two distinct pressure levels. As a result, the required precision in operating the dental instrument is deficient. Another disadvantage arises on account of the provision for the supply of gas in compressed form in cylinders. In view of the considerable volume of gas being used, cylinder replacement becomes a severe inconvenience. Thus, applicant has found that the use of equipment as described in Angell

**2**

is a disadvantage in treatment operations involving the use of abrasive-laden fluid streams.

The prior art use of abrasive-laden fluid streams for treatment of teeth has also suffered from the disadvantage of having significant excess and/or post-use abrasive particles in the area of the mouth during operation. The presence of such abrasive particles is not only uncomfortable to the patient being treated, but it may also constitute a hinderance to the dentist conducting the operation. This disadvantage is particularly relevant for cutting and abrading of teeth since the relatively high pressures required for such operations sometimes result in a cloud or mist of excess or post-use abrasive particles which make it difficult for the dentist to see the area being treated. This difficulty has heretofore not been fully overcome.

### OBJECTS AND SUMMARY OF THE INVENTION

In view of the deficiencies of the prior art, it is thus an object of the present invention to provide improved dental systems which utilize pressurized fluid streams containing abrasive particles for effectively and efficiently abrading, etching and cutting teeth or associated tooth structure. As used herein, by associated tooth structure is meant fillings, composites, facings, crowns, caps, amalgam and the like.

It is a further object of the invention to bring together the components needed to produce a novel and effective dental tool capable of overcoming past deficiencies of systems using abrasive-laden fluid streams.

It is a further object of this invention to provide dental apparatus for treating teeth via an abrasive-laden stream of high pressure fluid, such as air, in which the disadvantages associated with the presence of excess abrasive particles are eliminated or substantially reduced.

It is a further object of the present invention to provide dental apparatus which utilizes pressurized fluid streams containing abrasive particles wherein the apparatus is capable of operating selectively at two or more precisely controlled pressure levels.

These and other objects are satisfied by the preferred system aspects of the present invention. The present system is directed to the treatment of teeth by means of abrasive particles carried by a gas stream. According to one preferred embodiment, the system comprises, in combination with a source of air: means for increasing the pressure of said air to an initial pressure; a pressure selection means for selectively providing said air at least a first or a second pressure, each of said first and second pressures being less than about said initial pressure; an abrasive delivery means for combining the abrasive particles with said air at one of said first or second pressures to provide an abrasive-laden air stream; and nozzle means for delivering said abrasive-laden air stream to the teeth to be treated. According to another preferred embodiment, the system comprises, in combination with a source of air at an initial pressure: a pressure selection means for selectively providing said fluid at least at a first, a second, or a third pressure, each of said first, second and third pressures being less than about said initial pressure; an abrasive delivery means for combining finely divided abrasive particles with said air at one of said pressures to provide an abrasive-laden air stream; and nozzle means for delivering said abrasive-laden air stream to the teeth to be treated.

ClickPDF - www.fastio.com

Case 2:97-cv-00374 Document 8 Filed in TXSD on 08/27/97 Page 25 of 42

3

Another aspect of the present invention, which is preferably used in combination with the treatment system aspects hereof, is directed to evacuation systems especially well adapted for removing excess and/or post-use abrasive particles from in and around the area of the mouth during dental operations. Such systems preferably comprise a vacuum conduit having a first, relatively large diameter outer conduit member and a second, relatively small diameter inner conduit member, wherein said first and second members are movable in a longitudinal direction with respect to one another. In this configuration, the outer conduit member may be placed adjacent to the chin, cheek, or lips of the patient receiving treatment while the inner conduit member may be selectively positioned within the mouth of the patient being treated.

Another aspect of the present invention, which is optionally but not necessarily used in combination with one or more of the other aspects hereof, is directed to a system for controlling the pressure of the abrasive/air mixture leaving the delivery nozzle means. Such control systems preferably include pneumatic control means, such as fluid discharge ports on the handle of the dental apparatus for activating or deactivating the flow of pressurized fluid therein.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing the elements of one embodiment of the delivery system of the present invention.

FIG. 2 is a block diagram showing one embodiment of the pressure selector means 11 illustrated in FIG. 1.

FIG. 3 is a block diagram showing one embodiment of one aspect of the pressure selector means shown in FIG. 2.

FIG. 4 is a block diagram showing a second embodiment of one aspect of the pressure selecting means illustrated in FIG. 2.

FIGS. 5 and 5A are block diagrams showing a preferred embodiment of the treatment systems of the present invention, including the control systems therefor.

FIG. 5B is a view showing the abrasive delivery system with attendant controls.

FIG. 6 is a block diagram illustrating one embodiment of the treatment system of the present invention in combination with one embodiment of the evacuation system of the present invention.

FIG. 7 is a cross-sectional view of a two-stage evacuation nozzle according to one embodiment of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The present invention is directed generally to dental treatment systems and dental components adapted for use in connection with such systems. As the term is used herein, "treatment" refers to any operation for altering the physical condition of the teeth or gums by impacting same with an abrasive-laden fluid stream. As the term is used herein, "teeth" refers to teeth in their natural state as well as teeth that have been filled or otherwise modified by earlier dental treatment.

FIG. 1 is a schematic representation of a system embodying the present invention and utilizing a stream of operating fluid delivered through a conduit 100. The illustrated system comprises the following components: fluid supply means 101 connected to the conduit 100 for providing a stream of said fluid in a second conduit 102

4

at an initial pressure; pressure selection means 103 connected to the stream within conduit 102 for selectively providing a fluid stream within a conduit 104 at least at a first or second pressure, each of said pressures being less than about the initial pressure of the stream in conduit 102; means 105 connected to conduit 104 for combining said fluid stream within conduit 104 with abrasive particles to produce an abrasive-laden fluid stream within a delivery conduit 106; and handpiece means 107 connected to conduit 106 for discharging or delivering a stream or fluid jet 108 against the tooth or tooth structure of the patient to be treated.

Preferably, pressure selection means 103 also comprises means for selectively providing a substantially abrasive-free stream of pressurized fluid to said handpiece means 107 by means of a conduit 109. Thus, preferred systems of the type disclosed in FIG. 1 may alternatively and selectively be operated in a first mode wherein the abrasive-laden stream is provided to handpiece means 107 or a second mode wherein a substantially abrasive-free stream is provided to the handpiece. Applicant has discovered that highly desirable and beneficial characteristics are associated with dental treatment systems having such a pressure selection means. For example, the systems of the present invention are designed to provide abrasive-laden fluid streams for cutting of teeth, such as is required in preparation for filling of cavities with amalgam or the like. As the cavity is expanded by the abrasive-laden stream, the abrasive particles may sometimes tend to settle or collect in the cavity and produce a layer of abrasive particles in the cavity. The presence of this layer, in turn, may reduce the effectiveness of the cutting operation under certain conditions. Accordingly, it is a highly desirable aspect of the present invention that the dental treatment system of the present type be selectively operable between an abrasive-laden mode and an abrasive-free mode so that such layer can be readily removed by blowing with a stream of air. It has been found that the use of abrasive-free air acts to dry the tooth undergoing treatment which allows for better cutting and abrading efficiency.

As described above, an important consideration in achieving successful operation of dental treatment systems is the degree to which the system permits precise control and regulation of the fluid operating pressure. This consideration is important because the regulation of fluid pressure helps to control the action of the abrasive-laden stream on the tooth. However, the rate at which abrasive particles are delivered to the fluid stream is also frequently an important variable in achieving successful system operation. That is, fluid pressure and abrasive delivery rate each have an influence upon the cutting or abrading characteristics of the fluid stream. Moreover, it has been discovered that a specific correspondence or relationship between fluid pressure and abrasive delivery rate should exist in order to achieve results which are consistently commercially acceptable. Improper matching of these two operating parameters can preclude effective operation of the dental system. The pressure selection means 103 of the present invention preferably includes means for providing a control signal 110 for controlling the rate at which abrasive delivery means 105 provides abrasive to the fluid stream within conduit 104. The present system preferably operates such that the control signal 110 be modulated according to the pressure selected. In this way, the systems of the present invention are capable of

5,330,354

producing an abrasive delivery rate which is precisely matched to the pressure selected and hence to the desired operation. In general, it can be said that at relatively low pressures, abrasive powder tends to accumulate at relatively low points in the system, whereas by moving air at a faster rate, higher pressures above a given pressure, depending upon the design of the systems, will be effective to move all of the powder available.

The present system optionally includes means 112 (illustrated in FIGS. 6 and 7) in juxtaposition to the mouth of the person being treated for removing excess and/or post-use abrasive particles from in and around the mouth.

The present systems also optionally may include or are associated with a dental laser of the type described, for example, in U.S. Pat. Nos. 5,055,048, issued Oct. 8, 1991 and 4,940,411, issued Jul. 10, 1990. According to such preferred embodiments, the present treatment systems further include means for directing a beam of laser light toward the teeth of the patient being treated. In this way, the dentist or other dental professional may utilize the present system to alternatively and selectively treat the teeth of the patient with an abrasive-laden fluid stream or a dental laser.

The components of the present systems may be housed, either together or separately, in one or more suitable housings. In certain embodiments, however, it is preferred that the dental treatment systems be incorporated into a stand-alone, portable unit which can be transported to numerous locations and connected to the appropriate local power supply and fluid source. In such embodiments, it is preferred that the components are housed together on or in a relatively compact housing.

## A. FLUID SUPPLY MEANS

The nature and character of the fluid supply means 101 of the present invention may vary widely, depending upon numerous factors, such as the particular operating fluid being used. The material which comprises the fluid stream supplied through conduit 100 may also vary widely within the scope hereof, depending upon such factors as cost and availability, and the use of a wide variety of materials are within the scope hereof. It is preferred, however, that the fluid of the present invention comprise a gaseous material, and even more preferably air.

It will be also appreciated that the construction of fluid supply means 101 may vary depending upon factors such as the pressure of the operating fluid being used. For example, it is contemplated that in certain embodiments the fluid source within conduit 100 is provided at a pressure which is sufficiently high to operate the dental systems of the present invention without further compression. In such embodiments, the fluid supply means 101 may simply comprise, for example, a supply conduit for transporting the fluid from its source to the pressure selection means 103. As mentioned above, however, the preferred fluid, i.e., air, is generally only available in dental operatories at pressures limited to about 60 to at most about 90 psig. This source of operating fluid is preferred because of its ready availability and low cost. While air at such pressures may be acceptable for numerous dental applications, applicant has found that such pressures are insufficient to perform the preferred etching and cutting operations for which the present system is especially well

adapted. In particular, applicant has found that successful cutting, abrading and etching operations require a source of gas at a pressure of from about 80 to 200 psig. According to preferred embodiments, therefore, the preferred fluid source comprises operatory air at a pressure of less than about 80 to about 90 psig and the fluid supply means 101 comprises means for increasing the pressure of the operatory air to greater than about 80 psig, and even more preferably to a pressure of from about 80 to about 200 psig.

The pressure increasing means of the present invention may comprise any one of several well known structures for increasing the pressure of the selected fluid medium. The selection of any particular pressure increasing means will depend upon numerous factors such as flow rate, pressure differentials, sealing methods, methods of lubrication, power consumption, serviceability and cost. It is contemplated, therefore, that the pressure increasing means may take numerous forms within the scope hereof. For embodiments in which the operating fluid is a gas, it is contemplated that the pressure increasing means may comprise, for example: fans, both axial and centrifugal; compressors, both axial and centrifugal; rotary blowers; reciprocating compressors, both single stage and two stage; and ejectors. For embodiments in which the preferred fluid is air, the preferred means for increasing the fluid pressure comprises an air pressure intensifier of the type sold, for example, by Haskel Incorporated of Burbank, Calif. 97502, under Model No. MAA-2.5.

The fluid supply means 101 according to preferred embodiments also includes means for storing the pressurized fluid. The fluid supply means 101 also preferably includes means for stabilizing the pressure of fluid stream within conduit 102. According to simple and effective embodiments of the present invention, the means for storing the pressurized fluid also acts as the means for stabilizing the pressure of fluid stream 102. For example, the air exiting the pressure increasing means in the preferred embodiment is transported to a fluid supply tank adapted to maintain a reservoir of the pressurized air. This fluid supply tank not only provides a high pressure reservoir, it also serves to buffer or dampen the pressure spikes or fluctuations frequently encountered with dental operatory air. For preferred embodiments, especially those in which the present system is a substantially portable system, the fluid supply tank comprises an air storage bottle capable of maintaining at least one cubic feet of air at a pressure of about 250 psi. In this way, fluctuations in the pressure of the fluid exiting the fluid supply means are minimized.

## B. MEANS FOR SELECTIVELY REDUCING THE FLUID PRESSURE

With reference to FIG. 2, an important aspect of the present dental treatment systems resides in the provision of means 103 for selectively reducing the pressure of the fluid stream within conduit 102. In particular, means 103 makes the operating fluid selectively available at least at two and preferably at least three discrete pressure levels, said discrete pressure levels each preferably being less than about the initial pressure level of the fluid provided by the fluid supply means 101 but substantially above atmospheric. While it is contemplated that numerous structures may be adaptable for use as the pressure selection means, it is preferred that the pressure selection means 103 comprise inlet manifold means 114 connected to said fluid supply means 101 for

7

8

providing at least first and second flow paths 116 and 117 for the operating fluid. Each of said first and second flow paths 116 and 117 preferably include pressure regulating means 118 and 119 for precisely regulating the pressure in a downstream portion of the flow path. Unless the context clearly indicates otherwise, the term "downstream" refers to that region of the flow path downstream of the pressure regulating means and "upstream" refers to that region of the flow path upstream of the pressure regulating means. Each flow path is thus divided by its respective pressure regulating means into a high pressure upstream portion and a low pressure downstream portion. According to highly preferred embodiments, the flow paths are connected in parallel configuration. That is, the manifold means 114 is configured such that the upstream pressure in said first flow path 116 is substantially equivalent to about the upstream pressure in said second flow path 117.

The preferred selective pressure reduction means 103 is readily adaptable and well suited for selectively providing the operating fluid at three or more pressure levels, with each of said pressure levels being less than about the initial pressure of the fluid provided by the fluid supply means. Applicant has found that such an embodiment is especially beneficial for the provision of a dental treatment system well adapted for use in each of the following three dental operations: cutting, etching and abrading. Thus, it is highly preferred that the inlet manifold means 114 include means for providing a first flow path, a second flow path and a third flow path, each of said flow paths being connected in a parallel configuration. The use of such a configuration according to the preferred aspects of the present invention permits the utilization of three distinct, precisely controllable operating pressures for the dental instrument. Applicant has found that this is an important feature of such preferred embodiments since it allows flexibility of use while simultaneously preserving precise control and regulation of the necessary fluid stream. For use in applications where the cleaning of the teeth is contemplated, a fourth parallel flow path may be provided with pressure in the fourth flow path being regulated to a level which is lower than the other pressure levels.

With particular reference now to FIG. 3, the selective pressure reduction means 103 of the present invention also preferably includes selective valve means 120 and 121 in a portion, and preferably a downstream portion, of each of the flow paths 116 and 117 for selectively blocking and unblocking the flow of fluid through the respective flow paths. It is contemplated that numerous valves of the type known and available in the industry are adaptable for use for this purpose, and all such valves are within the scope of the present invention. According to preferred embodiments hereof, as disclosed more fully hereinafter, the valves of the present invention are preferably high pressure solenoid operated valves of a type well known in the art. Each of the flow paths also preferably includes in a downstream portion thereof, means 124 and 125 for preventing back flow of said pressurized fluid. The back-flow prevention means are preferably located in a portion of said flow path which is downstream of said valve means 120 and 121. In a typical arrangement, means 124 and 125 each comprise a check valve in the flow path immediately downstream of valve means 120 and 121, respectively, each such check valve being of any type and construction well known in the art. Additionally, a filters 122 for removing unwanted debris or particles

from the fluid should be included in a downstream portion of the flow paths. The filters are of particular importance in the prevention of the migration of abrasive back into the solenoid operated valves and the check valves, thus avoiding equipment failure.

Another aspect of the invention illustrated in FIG. 1 involves the supply of gas at a pressure close to but somewhat below the lower of any of the operating pressures established by the selective pressure reduction means, directly to the inlet of the abrasive particle delivery system. For reasons which will become apparent in the following, it is of importance that at start up, prior to the selection of any particular operating pressure level, the abrasive particle delivery system be immediately activated by the supply of regulated air under pressure. For this purpose, in systems where operatory air at pressures of about 80 psig is available in conduit 100, a branch conduit 123 delivers regulated air directly from line 100 to air/abrasive unit 105. In order to regulate the pressure of this air supply, a pressure regulator 126 is provided which maintains the pressure in line 123 at a preset limit, for example, between about 60 and about 80 psig.

The selective pressure reducing means 103 preferably comprises control means 127 for providing a control signal (indicated by dashed lines) to the valve means 120 and 121, thereby selectively opening and/or closing the valve means. In the preferred embodiments in which the valve means is a solenoid operated valve, the control means comprises a solenoid for each of said valves and an electrically operated circuit for opening and closing the solenoid valve, as more fully described hereinafter.

The pressure reducing means 103 also preferably includes an exit manifold means 128 connected to flow paths 116 and 117. The function of the exit manifold means 28 is to provide a source of fluid 104 at the selected pressure to the air/abrasive means 105. Thus, the exit manifold means 128 preferably comprises a conduit connected between a downstream portion of each of said flow paths 116 and 117 and said abrasive delivery means.

The selective pressure reduction means 103 also preferably includes pressure relief means for relieving fluid pressure in excess of that selected for the particular operation. Important functions of the pressure relief means are to ensure that pressure of the fluid is immediately adjusted to the selected pressure and, in addition, that it does not unexpectedly and unwantedly rise, because of a malfunction in the system, substantially beyond that pressure selected by the dentist or other dental professional. Control means is also preferably provided for selectively controlling the relief means such that the activating pressure of the relief means corresponds to or is slightly greater than the maximum pressure in the pressure range selected by the dentists. As the term is used herein, "activating pressure" refers to the pressure at which the pressure relief system relieves the build-up of pressure in the system.

It will be appreciated that the provision of such pressure relief means according to the present invention constitutes an important aspect of certain embodiments hereof. For example, the relief means provides a way of immediately establishing a selected pressure and gives the health professional a confidence that the desired pressure level is reliably at the pressure selected. In addition, it would be undesirable and potentially detrimental to the patient if the operating pressure in the

dental treatment system was suddenly and unintentionally raised above the selected operating pressure. If such were to occur, the rate of flow and the pressure of the jet stream leaving the dental handpiece would unexpectedly increase beyond the desired pressure range. This unexpected and undesired increase may not only reduce the efficacy of the desired dental treatment, it may also, depending upon the extent of the pressure increase, cause harm and injury to the patient being treated. Accordingly, it is important and highly desirable that the dental treatment systems of the present invention include mechanisms for ensuring that desired pressure is reliably established and that such an unexpected pressure increase does not occur.

An preferred configuration of the downstream portion of pressure selection means 103 is illustrated in FIG. 4. According to the embodiment of FIG. 4 and also indicated in FIG. 1, the system includes means for providing a substantially abrasive-free stream 109 to handpiece 107. Applicant has found that the provision of such means, particularly when such means is operable separately and independently of remaining portions of the pressure selection means, is highly desirable, as described hereinbefore. Accordingly, with reference to FIG. 4, the substantially abrasive-free delivery means comprises, for example, conduit 129 leading from a downstream portion of flow path 116 and selective valve means 131 in the flow path for selectively blocking and unblocking the flow of fluid therethrough. The conduit 129 also contains a pressure regulator 130 to regulate the pressure of the abrasive-free air flowing to the nozzle. Control means 127 is connected to valve means 131 for selectively and independently operating the valve means 131. A check valve 132 and filter 133 are preferably located downstream of valve means 131 for preventing the back flow of fluid or contaminants and abrasives therethrough.

As further illustrated in FIG. 4, the pressure relief means comprises a pressure relief means associated with each selectable pressure range. For example, relief means 134 and 135 are connected to exit manifold means 128 for relieving fluid pressure in the exit manifold to the extent such pressure is in excess of the fluid pressure selected. The exit manifold 128 will, depending upon the operating pressure selected, be subject to at least a relatively high pressure and a relatively low pressure. When the relatively low pressure is selected, no difficulty is presented. On the other hand, the presence of the low pressure relief means in fluid communication with the exit manifold would, in the absence of the pressure relief blocking means of the present invention, prevent operation in the relatively high pressure mode. Accordingly, each pressure relief means 134 and 135 is preferably connected to control means 127 such that the relief means is operative when the pressure range of its associated flow path is selected and inoperative when a higher pressure range is selected. Thus, each pressure relief means 134 and 135 preferably includes a valve means connected to control means 127 for selectively blocking and unblocking flow of pressurized fluid to the respective pressure relief mechanism, depending upon the pressure selected for operating the system. In operation, therefore, the valve means for each relief mechanism is activated to the unblocked position when the operating pressure range associated with that relief means is selected. Conversely, the valve means remains in the unactivated, blocked position when all higher pressure ranges are selected, thus assuring that the de-

sired pressure will be immediately and reliably available to the operator.

## C. CONTROL SYSTEM, ABRASIVE DELIVERY AND PRESSURE RELIEF MEANS

With reference now to FIGS. 5 and 5A, a preferred embodiment showing details of the selective pressure reducing means, including control systems and pressure relief means thereof is disclosed. As fully explained hereinafter, the system illustrated provides for selective delivery of air and abrasive at three discrete pressure levels or a supply of air free of abrasive. Turning first to FIG. 5, the illustrated system includes a source of fluid, preferably air, at a pressure of about 60 to about 90 psig and air supply means 101 which includes means for increasing the pressure of the air so as to supply a stream of air through line 102 at a pressure of from about 80 to about 200 psig. A valve 138 operated by a solenoid 139 is positioned upstream from the supply means 101. Valve 138 is a normally closed valve (hereinafter an NC valve) which is actuated to the opened position by the solenoid 139 upon the closing of a main switch 140. The opening of valve 138 allows the flow of air to a pressure regulator 141 in conduit 123 and to supply means 101 and conduit 102, a check valve 142 to an inlet manifold means comprising the common manifold conduit 143 which corresponds to manifold 20 in FIG. 2 and manifold branch conduits 144 through 146 and the connections therefor.

Each branch conduit 144 through 146 comprises a flow path for the pressurized air and includes therein pressure regulators 148 through 150 for regulating the pressure in a downstream portion of the respective conduit. Although the downstream pressures in conduits 144 through 146 may vary depending upon the particular operations contemplated, it is preferred that they be regulated to a pressure within a high pressure range, a mid pressure range and a low pressure range, respectively. More particularly, a high pressure range of about 160 to 180 psig is preferred for cutting and excavating of tooth enamel, a mid pressure range of about 120 to 140 psig is preferred for etching tooth enamel and a low pressure range of about 80 to 100 psig is preferred for cleaning teeth. In addition, manifold branch line 152, in which a pressure regulator 153 is located, provides for delivery of a supply of regulated air free of abrasives and a manifold branch line 154 in which a regulator 155 is located, provides for delivery of air free of abrasive to the teeth or for the evacuation of abrasive from the system downstream from the abrasive unit, as will be explained hereinafter.

Immediately downstream of the pressure regulators 148 through 150 and 153 are NC valves 148A through 150A operated by solenoids 148B through 150B, respectively. Downstream of the valves 148A through 150A are found check valves 156 through 158, respectively.

Exit manifold means comprising manifold conduit 160 is connected to and in fluid communication with a downstream portion of each of the conduits 144 through 146. Also connected to and in fluid communication with manifold conduit 160 is a pressure relief means comprising three relief valves 162 through 164 protected by NC valves 166 through 168 operated by solenoids 169 through 171, respectively.

Exit manifold conduit 160 leads from each of conduits 144 through 146 to abrasive delivery means 105 for producing a stream of abrasive-laden gas at the

5,330,354

11

desired pressure to a handpiece 107 through a conduit 172.

From the foregoing, it can be seen that upon closure of main switch 140, NC valve 138 is opened. This allows operatory air to flow through pressure regulator 141 directly to manifold 160 to pressurize the air abrasive delivery system which is preferably of the kind illustrated and claimed in U.S. Pat. No. 4,708,534 and as generally disclosed in FIG. 5B.

The system may further be provided with a switch 101A located in conjunction with the air reservoir within fluid supply means 101. Switch 101A prevents operation of the system, except when there is an adequate pressure level within the reservoir.

With particular reference to FIG. 5B, the preferred form of abrasive delivery system 105 will be described briefly. The system includes a sealed lower chamber 175 mounted on a base 176 and an abrasive powder supply vessel 177 which is bolted or otherwise fastened to the top of chamber 175. Located within chamber 175 is an upwardly open cylindrical particle feed receptacle 178 which is mounted on a vibratory device 179, as particularly described in the aforesaid U.S. Pat. No. 4,708,534. Cylindrical feed receptacle 178 is provided on its inner surface with a helical feed groove 180, the lower end of 25 which communicates with the bottom of the cylinder and the top of which is in communication with a feed tube 181 which delivers the particulate material through a section of resilient, flexible tubing 182 to an exit tube 183 which passes through the wall of vessel 30 175. Joined to tube 183 is a second section of resilient flexible tubing 184 which is in turn connected to a duct 172 which leads to handpiece 107, as is illustrated in FIGS. 5 and 5A.

Powder supply receptacle 177 is adapted to receive 35 and contain a supply of particulate abrasive matter, generally indicated by the reference character P and to supply the same in a uniform manner to the bottom of cylindrical feed device 178 through a feed tube 186 in a manner more particularly described in U.S. Pat. No. 40 4,708,534.

In order to bring the powder delivery system up to a pressure at which it is primed for operation, air under pressure, for example, of about 80 psi, is delivered to chamber 175 by way of a connection 187 which is connected to line 160 which is pressurized upon closure of valve 138 when main control switch 140 is closed. A branch conduit 188 also supplies air at the same pressure to the powder supply chamber 177 by means of a connection 189 which communicates with the interior of 50 the supply chamber 177.

Vibratory device 179 is an electrically operated device which is preferably activated off handpiece 107 by means to be described hereinafter. In general, the rate of vibratory feed is controlled by way of a preset adjustable control device 190 mounted on the equipment control panel in a convenient location. Device 190 may be set manually by the operator to a desired vibratory rate or optionally may be a pressure responsive device which automatically adjusts through connection to switch 191 so that an appropriate rate is provided for the operating pressure level as selected on switch 191.

The abrasive delivery system is also preferably provided with a normally closed valve 192 which is preferably a pinch valve of the kind illustrated more particularly in FIG. 10 of the aforesaid U.S. Pat. No. 4,708,534. Pinch valve 192 is controlled by a solenoid 193 either directly or through a fluid pressure device. The sole-

12

noid 193 is preferably energized upon closure of a switch activated off the handpiece to maintain pinch valve 192 in the open position whenever vibrator 179 is in operation.

In summary, when the main switch 140 is closed, chambers 175 and 177 are immediately pressurized at the low end of the operating pressure range so that the abrasive delivery system is readied for the delivery of a particulate-laden air stream through resilient tube 184 to conduit 185 when desired by the operator. Upon activation of the vibrator and opening of pinch valve 192 by the control circuitry, described hereinafter, particulate material advances upwardly within spiral groove 180 through duct 181 where it enters resilient, flexible tubing 182 and exit tube 183, where it exits container 175 and passes through tube 184 to join conduit 185.

It will be appreciated by those skilled in the art that it may be desirable to use different abrasives and/or different particle size abrasives for different dental operations. For example, it may be desirable to utilize abrasive particles having one set of characteristics for a first dental operation and a second set of characteristics for a second dental operation. While it is possible to manually change the type of abrasive being used, it is preferred that the abrasive delivery system of the present invention include means for selectively providing either a first abrasive particle or a second abrasive particle for mixing with the fluid stream. One apparatus capable of achieving this result is disclosed in U.S. Pat. No. 2,661,537 to Angell, which is incorporated herein by reference.

As explained above, closure of main switch 140 also allows the operatory air to be delivered to the air pressure intensifier within fluid supply means 101 which preferably increases the pressure of the available air to be supplied to a level of approximately 200 psig. Air at this pressure is then delivered through manifold conduit 143.

FIG. 5 further illustrates the system provided for controlling the selective pressure reduction means and for selective delivery to the handpiece of pure air under pressure or a pressurized air and abrasive mix as required. The control system preferably involves the use of separate pressure selector switch 191 and additionally includes controls on the dental handpiece 107, operation of the selective pressure reduction means being described first.

The pressure selector switch 191 is located in any convenient position on the control panel or optionally and/or additionally may be incorporated in a foot actuated switching device of a type well known in the art. As is illustrated in FIG. 5, when switch 191 is in the open position (as shown), the NC valves 148A through 150A remain closed and the flow of operating fluid through any one of valves 148A through 150A is thus blocked.

With switch 191 in any one of the closed positions, the appropriate solenoid 148B through 150B is energized, thereby allowing fluid to flow through the appropriate conduit 144 through 146. As seen in FIGS. 5 and 5A, conduit 144 through 146 deliver air to manifold 160 at a pressure established by the respective pressure regulator 148 through 150.

Since the pressure in conduit 160 can be within any one of the three above described pressure ranges, the pressure relief means includes first, second and third relief valves for relieving pressure in excess of said first, second and third pressure ranges, respectively. The first

13

relief valve 162 is calibrated with an activation pressure which corresponds to or is slightly greater than the maximum operating pressure in the downstream portion of flow path 144, while relief valves 163 and 164 are calibrated to have activation pressures which correspond to or are slightly greater than the maximum operating pressure in the downstream portions of flow paths 145 and 146, respectively. When a control signal is transmitted to solenoid 148B to open valve 148A, solenoid 169 is activated by the same control signal, thereby opening blocking valve means 166. However, blocking valves 167 and 168 remain closed, thereby isolating the relief valves 163 and 164 from the operating fluid when the system is operated in the high pressure mode. It will be understood that similar operation occurs in the mid- or low-pressure modes.

As indicated above, means are provided to deliver air at relatively low pressure as established by pressure regulator 153 through the conduit 152. This conduit bypasses the abrasive supply unit 105, delivering a regulated supply of air at a relatively low pressure directly to the inlet of the handpiece 107 to provide the operator with a stream of abrasive-free air useful for drying the region of the tooth as is frequently desired. For this purpose, normally closed valve 151A in line 152 is opened by energization of a solenoid 151B which is preferably controlled by a pressure operated switch activated by closure of one of a group of control ports on handpiece 107, as described below. Line 152 is further provided with a filter 152A and check valve 159 to isolate the valve components from the air and abrasive mixture.

In one condition of operation of the system, as will be described subsequently, the air delivered through line 152 may also be used to create a vacuum downstream from the abrasive delivery system so as to effect removal of the mixture of abrasive and/or debris from the interior of the handpiece.

As indicated just above, a plurality of control ports provided on the handpiece 107 enable certain functions of the system of the present invention. According to the preferred embodiment of the invention, shown in FIG. 5, the handpiece is preferably provided with four fluid control ports 194 through 197, each of which is conveniently located to be closed by a finger of the operator. Ports 194 through 197 are located in series-circuit relationship with a relatively low pressure supply of air, supplied for example, through branching conduit 154 and regulated by pressure regulator 155 (FIG. 5). The ports 194 through 197 control three normally open diaphragm operated pressure switches 198, 199 and 201 and one diaphragm operated latching switch 200, each of which receives pressurized air from conduit 154. So long as handpiece ports 194 through 197 are uncovered, air at a relatively low pressure passes through the diaphragm chamber of each of the switches 198 through 201 and exits through the ports. However, upon closure of a selected one of ports 194, 195 and 197, one or more of the normally open switches 198, 199 and 201 will be closed on account of the increase in pressure to which the diaphragm in the switch is subjected. In the case of latching switch 200, momentary closure of port 196 is effective to latch switch 200 in the closed position if initially opened and to return it to the open position if closed.

As illustrated in FIG. 5A, port 194 is a lamp activation port which communicates with the diaphragm chamber of switch 198 which, when closed, energizes a

14

circuit which lights a lamp 202 (which may include a fiber optic device) which casts a beam of light through an opening in the distal end of handpiece 107 for the purpose of illuminating the area of a tooth or related tooth structure being worked on by the operator. So long as port 194 is closed, the lamp 202 remains illuminated.

Port 195 is a light and air activation port which is in communication with normally open lamp switch 198 through a conduit 204 and 205 and in communication with the diaphragm chamber of normally open diaphragm operated switch 198 by means of conduits 204 and 205 so as to effect closure of switches 198 and 199 when port 195 is closed, thus turning on lamp 202 and activating solenoid 212 so as to close valve 213 to deliver air free of abrasive from conduit 152 to the handpiece.

Port 196 is a powder evacuation activator port which is in communication with latching switch 200 by means of conduit 206 and may also be in communication with the light switch 199 by means of a branch conduit 207. Upon closure of port 196, the light will be turned on and switch 200 closed to energize a solenoid 191A which activates switch 191 to turn on vacuum 221, as described hereinafter in reference of FIG. 6.

Port 197 is the port for activation of the powder delivery system and is in communication with normally open diaphragm operated switch 201 via lines 208 and 211. Closure of switch 201 by placing a finger over port 197 energizes solenoid 193 to open pinch valve 192 and turns on vibrator 179. Simultaneously, solenoid 212 is energized to close normally opened purge valve 213. The relatively high pressure air abrasive mixture is directed through conduit 172 and out through nozzle 107A. Since the pressure of the air and abrasive mix is high relative to the pressure of the air in line 152, check valve 159 blocks flow of pure air through line 152. However, as soon as the user removes his finger from port 197 to terminate the delivery of the air and abrasive mix, pure air again flows past the check valve 159. Opening of the switch deenergizes solenoid 212 to open pinch valve 213 so that air flows out through purge line 214. Because there is a small orifice in the tip of handpiece 107 relative to the cross-section of the purge line, the rush of air creates a vacuum.

As indicated in FIGS. 5 and 5A, the various branch circuits are provided with check valves to insure that closure of a particular port activates only through switches which are required to perform the functions indicated. In addition, filters 152A and 217 provided in lines 152 and 160 insure that abrasive does not enter the manifold system.

Although the use of the above-described fluid ports constitute a preferred method of control, it should be understood that electrically operated switches positioned on the handpiece and utilizing a low voltage power source could be employed without departing from the scope of the invention.

## D. DENTAL HANDPIECE MEANS

It will be appreciated by those skilled in the art that the particular form of the handpiece 107 may vary widely, depending upon factors such as cost and portability. In general, it is preferred that the handpiece be adapted to be carried and manipulated by the dentist or other dental professional. For this reason, handpiece 107 is generally formed in the shape of an elongate cylinder connected to the abrasive/fluid delivery means

Case 2:97-cv-00374  Document 8  Filed in TXSD on 08/27/97  Page 31 of 42

15

16

105 by way of the conduit 172 (see FIG. 5) which conduit should be flexible for ease of manipulation. A central bore in the handpiece transports the abrasive-laden fluid to a nozzle means 107A disposed at the distal end thereof.

In addition, the handpiece is provided with a fiber optic channel to accommodate lamp 202 and a fiber optic device which terminates at the distal end of portion 107A for the purpose of directing light in the area of impact of the abrasive particles. The nozzle means 107A may be, for example, frusto-conically shaped, thereby providing a cross-sectional flow area which reduces gradually from that of about the central bore to a relatively small opening in the end of the nozz e. This reduction in flow area results in a concomitant increase in fluid velocity, thereby producing a stream or jet of abrasive-laden fluid 108 which is effective for cutting, etching or cleaning teeth or related tooth structure, depending upon the operating pressure of the system. The particular configuration and construction of such handpieces is generally well known, and all such constructions are within the scope of the present invention. One such handpiece is shown in U.S. Pat. No. 2,696,049, which is incorporated herein by reference. As illustrated in the '049 patent, the nozzle portion of the delivery means is preferably readily removably attached to the handpiece. Such removability is beneficial in several respects. First, it will be appreciated that the flow of high velocity abrasives through the nozzle 107A of the present dental treatment systems will tend to cause wear and abrasion of the internal channel of the nozzle. This could, in turn, reduce the efficacy of the system. Accordingly, the provision of a removable nozzle permits replacement of the nozzle as needed to maintain the efficacy of the system. In addition, applicant contemplates that the nozzle 107A may, in certain embodiments, be comprised of a relatively inexpensive material, such as plastic. In such embodiments, it is expected that the nozzle would be discarded after each use. The provision of such a low cost, inexpensive replaceable nozzle has the obvious advantage of reducing a likelihood of the spread of infectious disease from one patient to the next. It is contemplated that the removability of the present nozzle may be achieved by providing the nozzle with a threaded portion, as disclosed in the '049 patent, or other means, such as providing a bayonet type attachment between the nozzle and the remainder of the handle portion. In addition, the entire handpiece should be separable from conduit 172 and from its associated control lines to permit autoclaving.

According to another preferred embodiment of the present invention, the portion of the nozzle which comes in contact with the abrasive-laden fluid stream may be formed of a hard, abrasion-resistant material, such as carbide. Thus, the nozzle itself can be formed of such carbide material, or formed of less expensive materials which are lined with carbide or similar abrasion-resistant materials.

## E. SYSTEM FOR EVACUATING ABRASIVE MATERIAL

In its preferred form, the dental treatment system of the present invention includes the provision of means for effectively and efficiently evacuating excess abrasive particles from the area of the mouth after treatment. As noted, above, the failure of prior art dental treatment systems to effectively deal with the continued removal of abrasive particles from the mouth has con-

tributed to the lack of acceptance of the systems. With particular reference to FIGS. 6 and 7, the invention preferably includes a two-piece vacuum nozzle means, generally indicated at 220, adapted to be placed in the mouth of a patient and a means 221 for creating a vacuum within the nozzle means so as to draw away the abrasive particles and debris.

Nozzle means 220 preferably includes an outer tubular housing section 222 and an inner tubular section 223 co-axially mounted within section 222 by means such as a support plate 224. Preferably, inner tubular member 223 has an outwardly flared portion 225 which is intended to be positioned adjacent to the region of the patient's mouth during treatment A plurality of spaced apart openings 226 are located in a plate 224.

Preferably, inner tubular conduit section 223 is frictionally fitted within a sleeve or collar 227 which is joined to support plate 224. The frictionally interfitting portions provide a means permitting longitudinal adjustment of inner tubular member relative to the outer section 222 so as to permit movement of the flared portion 225 to accommodate patients having different sized mouths and/or to allow for adjustment to bring the flare portion into different areas of the mouth.

Evacuator nozzle 220 is connected to a flexible hose 230 which is coupled onto the end of the outer tubular housing section 222. Preferably, the cross-sectional area of the openings 226 and the cross-sectional area of the inner tubular section 223 should roughly equal the cross-sectional area of tube 230 so as to avoid an unwanted choking down of the air drawn from the patient's mouth. As indicated in FIG. 6, conduit 230 preferably is connected to the vacuum means 221 which comprises a conventional electric motor operated vacuum system which preferably includes a rigid, removable disposable container 232 within which the used abrasive and debris is collected. A normally closed valve 233 within conduit 230 blocks flow through the conduit. Valve 233 is operated by a solenoid 234 which is operated off pressure selector switch 191. In addition, pressure selector switch 191 operates electric motor for vacuum means 221 so as to draw air from the nozzle 107 and the patient's mouth area as soon as a particular pressure is selected, thereby avoiding the possibility of excess abrasive escaping to the atmosphere. With the system described, substantially all abrasive delivered to the patient's mouth, as well as the debris created by the cleaning, abrading and cutting operations, is captured by the vacuum system and delivered to the rigid disposable container 232 which is preferably readily sealable for separate handling and disposable at a medical disposal waste site, if necessary.

The operation of the illustrative embodiment of the invention will now be briefly summarized with particular reference to FIGS. 5A and 5B.

When main power switch 140 is turned on, solenoid 139 effects the opening of valve 138 delivering air under pressure of between about 60 and 90 psig to the pressure intensifier 101. Simultaneously, a regulated supply of air is delivered through conduits 123 and 160 to the air abrasive delivery unit priming this unit by pressurizing chamber 175 and powder supply 177.

The operator chooses the particular operating pressure for delivery of the air-abrasive mixture through use of selector switch 191 which may be conveniently located on the instrument panel or, alternatively, through a four-position foot activated switch, not shown, having

CutPDF - www.fastio.com

**17**

four actuating positions which are connected in parallel with the contacts of switch 191.

At this point, the device is fully primed for operation which is achieved through selective control by closure of an appropriate port on the dental handpiece 107. If the operator wishes to only illuminate the tooth or related tooth structure to be worked on, he closes finger port 194 which effects closure of the lamp circuit to light lamp 202. If the operator then wishes to direct a jet of drying air to the tooth or tooth structure, finger port 195 is closed which effects energization of the lamp circuit and a closure of purge valve 213.

Closure of port 196 latches switch 200 in the closed position which activates the vacuum system of FIG. 6. Finally, when the operator is ready to apply the air abrasive mix to the tooth or tooth region, the covers port 197 which energizes solenoid 193 to open pinch valve 192, turns on vibrator 179 and closes normally open purge valve 213. When port 197 is uncovered, the flow of air and abrasives stops, the purge valve 213 is opened and air through line 152 purges portions of the system downstream of abrasive unit 105 of abrasive materials.

In the illustrative embodiment, the vacuum system is activated whenever pressure selection switch 191 is turned on with the result that abrasive particles and tooth debris are drawn from the region of the patient's mouth whenever an air/abrasive mixture is delivered by the handpiece as well as when drying air alone is delivered and when the operator is merely inspecting the area being treated.

Through the unique combination of pressure relief valves 162 through 164 and blocking valves 166 through 168, the pressure chosen for use in the treatment of teeth may be readily and rapidly changed by use of selector switch 191. When switching from a higher to a lower operating pressure, the change occurs immediately, enabling the operator to work confidently and without delay. Still further, switch over from cutting and abrading to the use of air only for cleaning and drying the tooth region being worked on or the use of the light only can be readily and rapidly accomplished by controls conveniently located on the dental handpiece.

What is claimed is:

1. A system for performing a dental procedure on teeth or associated tooth structure by means of abrasive particles carried by a fluid stream comprising, for use with a source of fluid at a pressure above atmospheric pressure;

   (a) means for increasing the pressure of said fluid to about an initial pressure;

   (b) pressure selection means for selectively providing said fluid at at least a first pressure or a second pressure, each of said first and second pressures being less than about said initial pressure;

   (c) abrasive mixing means for combining the abrasive particles with said fluid at either said first pressure or said second pressure to provide an abrasive-laden fluid stream;

   (d) selectively operable means for activating and deactivating said abrasive mixing means; and

   (e) nozzle means for delivering said abrasive-laden fluid stream to the teeth or tooth structure undergoing said dental procedure.

2. The system of claim 1 wherein said system is a unitary system substantially contained in a single housing.

**18**

3. The system of claim 2 wherein said housing is a portable housing.

4. The system of claim 1 wherein said fluid is air.

5. The system of claim 1 wherein said source of pressurized fluid comprises compressed air at a pressure of less than 100 psig.

6. The system of claim 5 wherein said initial pressure is greater than about 100 psig.

7. The system of claim 6 wherein said initial pressure is from about 120 to about 200 psig.

8. The system according to claim 5 further including fluid supply means independent of said pressure selection means for providing said abrasive mixing means with pressurized fluid at a pressure value below said initial pressure.

9. The system according to claim 8 further including selectively operable means bypassing said abrasive mixing means for delivery of a pressurized stream of abrasive-free fluid to said nozzle means.

10. The system according to claim 9 wherein said means for bypassing said abrasive mixing means includes a purge circuit in communication with said nozzle means, and control means for activating said purge circuit for removal of abrasive particles from said nozzle means upon deactivation of said abrasive mixing means.

11. The system according to claim 10 further including a switch means associated with the nozzle means and activated by a finger of the operator, said switch means being operable to activate the means bypassing the abrasive mixing means for delivery of said pressurized abrasive-free stream of fluid through said nozzle means.

12. The system according to claim 11 further including a vacuum activating switch associated with said nozzle means and positioned to be activated by a finger of the operator, and vacuum means operable upon activation of said vacuum switch for removing abrasive particles and debris from the region of the mouth of a patient undergoing said dental procedure.

13. The system according to claim 12 further including an abrasive delivery switch means associated with the nozzle means and activated by the hand of the operator, said abrasive delivery switch means being operable to activate the abrasive mixing means to deliver said abrasive-laden fluid stream through said nozzle means to the teeth or tooth structure undergoing said dental procedure.

14. The system according to claim 13 wherein said nozzle means includes a hand-held device adapted to be held in the hand of the user practicing the dental procedure and wherein said switch means include fluid ports positioned on said hand-held device in position to be actuated by the fingers of the user.

15. The system of claim 1 wherein said fluid pressure increasing means comprises at least two pressure increasing means.

16. The system of claim 1 wherein said pressure selection means comprises inlet manifold means connected to said pressure increasing means for providing at least first and second flow paths for said fluid.

17. The system of claim 16 wherein said first and second flow paths are parallel flow paths.

18. The system of claim 17 wherein each of said first and second flow paths include pressure regulating means for regulating the pressure in a downstream portion of said flow paths.

ClickPDF - www.fasto.com

5,330,354

**19**                                        **20**

19. The system of claim 16 wherein said at least first and second flow paths comprise at least first, second and third flow paths and a pressure regulating means for maintaining first, second and third different pressures in said flow paths.

20. The system of claim 19 wherein said first, second and third flow paths are parallel flow paths.

21. The system of claim 1 further comprising means for evacuating excess abrasive materials, post-use abrasive materials and other debris from the area of the mouth being treated.

22. The system of claim 21 wherein said evacuation means includes means in juxtaposition to the mouth of the patient for creating a negative pressure zone effective to withdraw abrasive materials and debris and a rigid substantially closed abrasive collection container for collection of said materials and said debris.

23. The system of claim 1 wherein said pressure selection means comprises means for providing a signal to said mixing means for controlling the rate at which said particles are mixed with said fluid.

24. The system of claim 23 wherein said control signal is dependent upon the pressure of said fluid being combined with the abrasive.

25. A system for the practice of a dental procedure on teeth or associated tooth structure by the use of an abrasive-laden fluid stream comprising, in combination with a source of pressurized fluid at an initial pressure:
   (a) manifold means connected to said source of pressurized fluid for providing at least first and second parallel flow paths for said pressurized fluid;
   (b) first pressure reducing means in said first flow path for providing said fluid at a first pressure in a portion of said first flow path downstream of said first pressure reducing means, said first pressure being less than about said initial pressure;
   (c) second pressure reducing means for providing said fluid at a second pressure in a portion of said second flow path downstream of said second pressure reducing means, said second pressure being less than about said first pressure;
   (d) second manifold means for combining said first and second flow paths;
   (e) pressure selection means for selectively blocking or unblocking fluid communication between said second manifold means and said downstream portions of each of said flow paths;
   (f) abrasive mixing means for combining pressurized fluid from said second manifold means with the abrasive material to produce a pressurized stream of abrasive-laden fluid; and
   (g) delivery means for delivering said stream of abrasive-laden fluid to the teeth or tooth structure undergoing said dental procedure.

26. The system of claim 25 wherein said pressurized fluid is air.

27. The system according to claim 26 further including an abrasive evacuation means, including a negative pressure device positioned in juxtaposition to the mouth of the patient for evacuation of abrasives and tooth debris, said evacuation means including a rigid, sealable and removable disposable abrasive collection container for disposal of said abrasive and said debris.

28. The system according to claim 26 further including an abrasive evacuation means including a negative pressure device positioned in juxtaposition to the mouth of the patient for the evacuation of abrasives and tooth debris.

29. The system of claim 25 wherein said pressure selection means comprises a valve in a downstream portion of each of said flow paths.

30. The system of claim 29 wherein said valves comprise solenoid operated valves.

31. The system of claim 30 wherein said pressure selection means comprises a control means for providing a control signal for selectively opening said solenoid operated valves.

32. The system of claim 31 wherein said control means includes an operator-actuated electrical switch for selectively opening and closing each said solenoid operated valves.

33. The system of claim 32 wherein said control means includes a pneumatically operated activator means for selectively opening and closing said switch.

34. The system of claim 33 wherein said control means includes a ported chamber in said delivery means, said ported chamber being in fluid communication with said pressure operated switch whereby said pneumatically operated switch is operated by covering and uncovering said ported chamber by a finger of the operator.

35. A system according to claim 25 further including pressure relief means in communication with said second manifold means for relieving pressures prevailing in said second manifold means above said second pressure when said pressure selection means selectively unblocks said second flow path.

36. A system for the practice of a dental procedure on teeth or associated tooth structure comprising:
   a source of pressurized fluid at an initial pressure above atmospheric pressure;
   inlet manifold means for providing at least first and second parallel flow paths for said fluid;
   pressure selection means selectively establishing a first pressure in said first flow path and a second pressure in said second flow path, each of said pressures being less than said initial pressure;
   a common outlet manifold for said first and second flow paths;
   abrasive mixing means connected to said common outlet manifold for combining abrasive particles with said fluid at about either said first or said second pressure to provide an abrasive-laden fluid stream; and
   nozzle means connected to said abrasive mixing means for delivering said abrasive-laden fluid stream to the teeth or tooth structure undergoing said dental procedure.

37. The system of claim 36 wherein said initial pressure is from about 120 to about 200 psig.

38. The system of claim 37 wherein said pressure regulator means includes means for regulating the pressure in said second flow path from about 80 to about 120 psig and the pressure in said third flow path from about 50 to about 80 psig.

39. The system of claim 38 further including a fourth flow path connected to said inlet manifold means, said fourth flow path bypassing said abrasive mixing means and being in fluid communication with said nozzle means, and selectively operable valve means movable between a first position to block flow through said fourth flow path and a second position for allowing flow through said fourth flow path whereby abrasive-free air is selectively delivered through said nozzle means.

40. The system according to claim 39 further including a purge conduit means in communication with said nozzle means and said fourth flow path, said purge conduit means including a purge valve selectively operable and control means for activating said purge valve for direction of air from said fourth flow path and said nozzle means through said valve, activation of said purge valve effecting removal of abrasive particles from portions of said system downstream from said abrasive mixing means.

41. The system according to claim 40 including means for activating said purge valve upon deactivation of said abrasive mixing means.

42. A system according to claim 36 wherein the pressure established in said first flow path is higher than the pressure established in said second flow path, said system further comprising:

a first pressure relief valve in communication with said common outlet manifold for relief of pressure above said first pressure;

a second pressure relief valve in communication with said common outlet manifold for relief of pressure above said second pressure;

first valve means for isolating said first pressure relief valve from said common outlet manifold when said second pressure is established in said second flow path; and

second valve means for isolating said second pressure relief valve from said common outlet manifold when said first pressure is established in said first flow path.

43. The system of claim 42 wherein said pressure regulating means in said second flow path provides a downstream pressure in said flow path of from about 80 to about 120 psig and the pressure regulating means in said third flow path provides a downstream pressure in said flow path of from about 50 to about 80 psig.

44. A system for the practice of a dental procedure on teeth or associated tooth structure comprising:

a source of pressurized gas at an initial pressure above atmospheric;

pressure selection means for selectively providing said gas at least at a first, second and a third pressure, each of said pressures being different and being less than about said initial pressure;

said pressure selection means including common inlet manifold means connected to said source and including conduits providing at least first, second and third flow paths for said fluid, said pressure selection means establishing said first pressure in said first flow path, said second pressure in said second flow path and said third pressure in said third flow path;

abrasive mixing means for combining abrasive particles with said fluid at about either said first or second pressure to provide an abrasive-laden fluid stream; and

nozzle means for delivering said abrasive-laden fluid stream to the teeth or tooth structure undergoing said dental procedure.

45. The system of claim 44 wherein said first, second and third flow paths are parallel flow paths.

46. The system of claim 45 wherein at least said second and third flow paths include pressure regulating means for regulating the pressure in each said flow path and a common conduit interconnecting each said flow path with said abrasive mixing means.

47. The system according to claim 46 wherein the pressure provided in said first path is higher than the pressure provided in said second path and the pressure provided in said second path is higher than the pressure provided in said third path, at least said second and third flow paths further having pressure relief means in communication therewith, said pressure relief means being responsive to the pressure in said common conduit for relief of pressure above the pressure in said second flow path when the second of said pressures is selected and for relief of pressures above the pressure in said third flow path when the third of said pressures is selected.

48. A system for performing a dental procedure on teeth associated tooth structure by means of abrasive particles carried by a fluid stream comprising:

pressure increasing means for increasing the pressure of said fluid stream to an initial pressure;

pressure selection means connected to said pressure increasing means for selectively providing said fluid at a plurality of preselected pressure values below said initial pressure;

pressure relief means for each said preselected pressure value, said pressure relief means being operative at pressures above each said preselected pressure value for relief of pressure above each said preselected pressure value when said preselected pressure value is selected;

abrasive mixing means for combining the abrasive particles with said fluid at each said preselected pressure value to provide an abrasive-laden fluid stream;

selectively operable means for activating and deactivating said abrasive mixing means; and

nozzle means for delivering said abrasive-laden fluid stream to the teeth or tooth structure undergoing said dental procedure.

49. A system according to claim 48 further including a purge conduit means in communication with said nozzle means, said purge conduit means including a purge valve selectively operable and control means for activating said purge valve for direction of fluid from said nozzle means through said purge valve, activation of said purge valve effecting removal of abrasive particles from portions of said system downstream from said abrasive mixing means.

50. The system according to claim 49 including means for activating said purge valve upon deactivation of said abrasive mixing means.

51. The system according to claim 48 further including an abrasive evacuation means, including a negative pressure device position in juxtaposition to the mouth of the patient for evacuation of abrasives and tooth debris.

* * * * *

Case 2:97-cv-00374 Document 8 Filed in TXSD on 08/27/97 Page 34 of 42

Case 2:97-cv-00374   Document 8   Filed in TXSD on 08/27/97   Page 35 of 42



## FIG. 1



## FIG. 2

## FIG. 3



FIG. 4

Case 2:97-cv-00374   Document 8   Filed in TXSD on 08/27/97   Page 37 of 42



FIG. 5

Case 2:97-cv-00374  Document 8  Filed in TXSD on 08/27/97  Page 38 of 42



FIG. 5A

CMPDF - www.fastio.com

Case 2:97-cv-00374  Document 8  Filed in TXSD on 08/27/97  Page 39 of 42

## FIG. 5B



ClibPDF - www.fastio.com

Case 2:97-cv-00374  Document 8  Filed in TXSD on 08/27/97  Page 40 of 42



## FIG. 6

## FIG. 7



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

AMERICAN DENTAL TECHNOLOGIES, INC.

   Plaintiff,

v.

KREATIV, INC.

   Defendant.

Civil Action No.C-97-374

## [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION
## TO TRANSFER VENUE TO THE DISTRICT OF OREGON

  Defendant Kreativ, Inc. moves to transfer venue to the District of Oregon pursuant to

28 U.S.C. § 1404(a).  For the convenience of the parties and witnesses, and in the interest of

justice, Kreativ's motion to transfer venue is GRANTED.  The clerk of court is directed to

transfer all records and papers in this action to the clerk of court for the District of Oregon.

IT IS SO ORDERED.

Dated:

            _____
            Janis Graham Jack
            United States District Judge

21368124
082697

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

AMERICAN DENTAL TECHNOLOGIES, INC.

     Plaintiff,

v.

KREATIV, INC.

     Defendant.

Civil Action No. C-97-374

## [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION
## TO TRANSFER VENUE TO THE EASTERN DISTRICT OF MICHIGAN

Defendant Kreativ, Inc. moves to transfer venue to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a). For the convenience of the parties and witnesses, and in the interest of justice, Kreativ's motion to transfer venue is GRANTED. The clerk of court is directed to transfer all records and papers in this action to the clerk of court for the Eastern District of Michigan, Southern Division.

IT IS SO ORDERED.

Dated:

_____
Janis Graham Jack
United States District Judge

21368126
082697